UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

VIDEO ELEPHANT LTD.

        Plaintiff,

    -v-

BLAKE BROADCASTING LLC,

        Defendant.

-------------------------------------------------------x

BLAKE BROADCASTING LLC,

        Defendant / Counterclaim
        Plaintiff,

     -v-

VIDEO ELEPHANT LTD.

        Plaintiff / Counterclaim
        Defendant.

-------------------------------------------------------x

BLAKE BROADCASTING LLC,

        Defendant / Third-Party
        Plaintiff,

     -v-

JOHN JORDAN,

        Third-Party Defendant.

-------------------------------------------------------x

No.    21-CV-0503-LTS

<u>MEMORANDUM ORDER</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff Video Elephant

Ltd. ("Video Elephant") moves to dismiss four counterclaims asserted by Defendant Blake Broadcasting LLC ("Blake") against Video Elephant (docket entry no. 40 (the "Motion to Dismiss")) in this case involving claims of breach of contract and breach of fiduciary duty.  The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1332.  The Court has thoroughly reviewed the parties' submissions, and, for the following reasons, the Motion to Dismiss is granted in part and denied in part.

<u>BACKGROUND</u>

The following facts are drawn from Video Elephant's Complaint and Blake's Answer and Counterclaims.  For purposes of this motion practice, well-pleaded factual allegations in Blake's Answer and Counterclaims are taken as true and are construed in the light most favorable to Blake.  Video Elephant is an Ireland-based company that licenses and distributes "news, entertainment, sports, and other related content."  (Docket entry no. 33 ("Answer")  ¶ 7.)  Third-party defendant John Jordan was the Chief Operating Officer ("COO") of Video Elephant at all times relevant to the instant dispute.  (<u>Id.</u> ¶ 8.)  Video Elephant alleges that it generally does not own the media content it licenses and instead operates as a broker between content creators ("creators") and end users ("licensees").  (Docket entry no. 1 ("Complaint") ¶ 13.)  In a typical licensing arrangement, Video Elephant will enter into two simultaneous contracts: a licensing agreement between Video Elephant and the creator, and a sublicensing agreement between Video Elephant and the licensee.  (Answer ¶ 14.)

Blake Broadcasting is a Florida-based company with its principal place of business in Miami, Florida.  (<u>Id.</u> ¶ 6.)  Blake is a provider and distributor of "entertainment, sports, e-sports, and fashion news . . . through a variety of media and broadcast channels[.]"  (<u>Id.</u>)

By press release dated September 12, 2019, Blake announced that it had named Video Elephant as its "exclusive licensing management company."  (Docket entry no. 33-1 ("Press Release"); see also Answer ¶¶ 12-13.)  In this role, "Video Elephant was tasked with identifying, licensing, and securing content for Blake [] that Blake [] could then distribute through its various media channels."  (Id. ¶ 17.)  Blake alleges that, "[a]round this same time," it "also retained [John] Jordan, both in his capacity as COO for Video Elephant and in his individual capacity, to serve as a member of Blake Broadcasting's 'Key Management Team.'"  (Id. ¶ 14.)  In this role, Blake alleges, Jordan "worked closely with Blake [] to draft and develop" its "Confidential Business Plan."  (Id. ¶ 16.)

Between 2019 and 2020, Video Elephant and Blake entered into three separate sublicensing agreements (the "Three Agreements"), with media content sourced from three different content producers, FCCE BV ("FCCE"), Bloomberg L.P. ("Bloomberg"), and Greenlight International ("Greenlight") (collectively, the "Producers").  (Id. ¶¶ 18, 20.)  In each of the Three Agreements, Video Elephant was identified as the "Licensor" and Blake as the "Licensee."  (Complaint ¶ 21; Answer ¶¶ 35, 91.)  Copies of the Three Agreements are annexed to the Complaint.  (Answer ¶¶ 34, 76, 90; docket entry no. 1-1 (the "Bloomberg Agreement"); docket entry no. 1-4 (the "FCCE Agreement"); docket entry no. 1-6 (the "Greenlight Agreement").)  Video Elephant obtained the rights to sublicense the content via agreements directly with the Producers.  (Answer ¶ 18.)  John Jordan, in his role as COO of Video Elephant, oversaw these licensing and sublicensing deals.  (Id. ¶¶ 11, 21.)

On January 20, 2021, Video Elephant filed its Complaint in this action against Blake, asserting three breach of contract claims, one as to each of the Three Agreements.  (Complaint ¶¶ 97-112.)  Video Elephant claims that Blake breached the Three Agreements by

failing to pay the licensing fees according to the terms of the respective contracts, and seeks

damages in the amount of the allegedly unpaid invoices.  (See id.)  Blake responded on

November 12, 2021, denying Video Elephant's breach of contract claims, and asserting four

counterclaims and two third-party causes of action against John Jordan.[1]  (See generally

Answer.)  The four counterclaims (Counterclaims One, Three, Four, and Six) against Video

Elephant assert breach of fiduciary duty and breach of contract claims as to each of the Three

Agreements.  (Id. ¶¶ 104-21, 141-64, 172-78.).  In total, Blake seeks no less than $52,000,000 in

damages for the four counterclaims raised.  (Id. ¶¶ 121, 156, 164, 178.)  Video Elephant moves

pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss each of the four counterclaims.

(See generally Motion to Dismiss.)


DISCUSSION

On a Rule 12(b)(6) motion, a court may dismiss a complaint for "failure to state a

claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell

Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when the

pleaded factual content "allows the court to draw the reasonable inference that the defendant is

---

[1]     A summons was issued as to John Jordan on November 15, 2021 (docket entry no. 37),
but Mr. Jordan has yet to be served in connection with this action.  (See docket entry no.
45 ("Porter Declaration").)  In November and December of 2021, counsel for Blake
attempted to reach out to Mr. Jordan via counsel for Video Elephant, and then to reach
out directly to Mr. Jordan upon being informed that counsel for Video Elephant did not
intend to represent Mr. Jordan.  (Id. ¶¶ 8-10.)  Mr. Jordan, allegedly a resident of Ireland,
declined to waive service.  (Id. ¶¶ 5, 9-10.)  There is no indication in the parties' briefing
or on the docket that Blake subsequently attempted to serve John Jordan.

liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant acted unlawfully."  Iqbal, 556 U.S. at 678.  The factual allegations pleaded "must be enough to raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555 (citation omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Iqbal, 556 U.S. at 679.  Thus, the Court must "consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor."  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).  The presumption of truth, however, "is inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. at 72 (citation and internal quotation marks omitted).  A counterclaim plaintiff thus must provide "more than labels and conclusions" to show entitlement to relief.  Twombly, 550 U.S. at 555.

Applicable State Law

A threshold issue for the Court is what state law governs the counterclaims in dispute.  "A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state."  GlobalNet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 382 (2d Cir. 2006) (citations omitted).  Under New York choice-of-law rules, a court must first determine "whether there is an actual conflict between the laws of the jurisdictions involved."  Id. (citations omitted).  Where no conflict exists, and New York law "is among the relevant choices, New York courts are free to apply it."  IBM v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004) (citations omitted).  The relevant forum's choice-of-law rules will also govern the

validity of a contractual choice-of-law clause.  <u>Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.</u>, 414 F.3d 325, 332 (2d Cir. 2005) (citation omitted).  "New York law is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract so long as the state selected has sufficient contacts with the transaction."  <u>Hartford Fire Ins. Co v. Orient Overseas Containers Lines (UK) Ltd.</u>, 230 F.3d 549, 556 (2d Cir. 2000) (citation omitted).  "Because a choice of law analysis is fact-intensive, courts often decline to make a choice of law determination at the motion to dismiss stage," unless "the relevant facts are sufficiently clear."  <u>Holborn Corp. v. Sawgrass Mut. Ins. Co.</u>, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (citations omitted).

Jurisdictions that are potentially relevant to the instant dispute include Ireland, where Video Elephant is domiciled; Florida, where Blake is domiciled; and Delaware and New York, by virtue of the contracts' express choice-of-law provisions.  The FCCE and Greenlight Agreements stipulate that the respective agreements shall be "construed exclusively" in accordance with United States law (FCCE Agreement § 6(k); Greenlight Agreement § 7(j)), and that the "Courts of the county of New York, New York City" (FCCE Agreement § 6(k)) and "the Courts of New York" (Greenlight Agreement § 7(j)), respectively, shall have exclusive jurisdiction.  The relevant provisions of the Bloomberg Agreement stipulate that the "Agreement and the legal relations among the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware," and that "[t]he parties hereto . . . consent and submit to the exclusive jurisdiction of the state and federal courts located in the County of New York[.]" (Bloomberg Agreement, Terms and Conditions § 11.15.)

Video Elephant argues that Ireland law is inapplicable to the FCCE and Greenlight Agreements, as the above-cited provisions demonstrate "the parties' intent . . . that

those agreements be construed in accordance with United States law," leaving only New York and Florida law as potentially applicable.  (Docket entry no. 41 ("CC-Def. Mem.") at 9.) Comparing the elements of a breach of contract claim under those two jurisdictions, Video Elephant concludes that "there is no conflict and New York law should apply" to both breach of contract counterclaims asserted by Blake under the FCCE and Greenlight Agreements.  (Id. at 10.)  Similarly finding no conflict between the elements of a claim for breach of fiduciary duty as between Florida and New York law, Video Elephant asserts that New York law should also govern Blake's breach of fiduciary duty counterclaims.  (Id. at 10-11.)  Finally, Video Elephant argues that Delaware law should govern the breach of contract counterclaim under the Bloomberg Agreement due to that Agreement's choice-of-law provision.  (Id. at 11.)  Although agreeing that it had not "identified a potential conflict between the laws of these various jurisdictions," Blake declined to undertake a choice of law analysis at this stage, instead consenting to application of New York and Delaware law as proposed by Video Elephant "[f]or purposes of this motion only."  (Docket entry no. 44 ("CC-Pltf. Mem.") at 12.)

Because there are no obvious conflicts among the laws of the potentially applicable jurisdictions, the relevant facts are not "sufficiently clear" from the record thus far,[2] and this issue has not been briefed in full by both parties, the Court will apply New York law to the relevant breach of fiduciary counterclaim and the breach of contract counterclaims as to the FCCE and Greenlight Agreements, and apply Delaware law to the breach of contract counterclaim as to the Bloomberg Agreement, as the parties do, in this preliminary determination regarding the sufficiency of Blake's counterclaims pursuant to Rule 12(b)(6).

---

[2]     The parties do not, for example, explain the relationship between the Bloomberg Agreement and the state selected in the Agreement's choice-of-law provision, Delaware.

Breach of Fiduciary Duty Claim Against Video Elephant

      Blake's first counterclaim asserts a breach of fiduciary duty claim against Video Elephant, purportedly stemming from Blake's "agency relationship" with Video Elephant. (Answer ¶¶ 104-21.)  "To state a cause of action to recover damages for breach of fiduciary duty, a plaintiff must allege: '(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.'"  Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 241 (2d Cir. 2020) (quoting United States Fire Ins. Co. v. Raia, 942 N.Y.S.2d 543, 545 (N.Y. App. Div. 2d Dep't 2012)).  New York law defines a fiduciary relationship as a relationship where "confidence is reposed on one side and there is resulting superiority and influence on the other."  Roni LLC v. Arfa, 963 N.E.2d 123, 124-25 (N.Y. 2011) (citation omitted).  There are no "precise limits on the scope of relationships that may be considered fiduciary."  Uddo v. Deluca, 837 F. App'x 39, 42 (2d Cir. 2020) (citing Penato v. George, 383 N.Y.S.2d 900, 904 (N.Y. App. Div. 2d Dep't 1976)).  Rather, the term embraces both "technical fiduciary relations and those informal which exist whenever one man trusts in, and relies upon, another."  Penato, 383 N.Y.S.2d at 904-905 (citations omitted).

      It is well-established under New York law that "a conventional business relationship" typically "does not create a fiduciary relationship," Faulkner v. Arista Records LLC, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (citation omitted), and, if the relevant parties have entered into a contract, courts will generally look to the contract "to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency."  EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 19-20 (N.Y. 2005) (citation omitted).  Equally fundamental, however, is the principle that "fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the

beneficiary but results from the relation."  Id. (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 874, cmt. B (Am. L. Inst. 1979)).  In more formal business transactions, where a contract primarily governs the relevant parties' obligations, New York courts have found fiduciary relationships to be plausibly alleged, at least for pleading purposes, "where the complaining party sets forth allegations that, apart from the terms of the contract, the [parties] created a relationship of higher trust than would arise from the [contractual] agreement alone."  EBC I, Inc., 5 N.Y.3d at 20.  Because the existence of a fiduciary relationship is necessarily fact-specific, "usually . . . a claim alleging the existence of a fiduciary duty is not subject to dismissal in a [Rule] 12(b)(6) motion," unless conclusory in nature, "given the generous pleading standard established in Fed. R. Civ. P. 8."  Boley v. Pineloch Assocs., Ltd., 700 F. Supp. 673, 681 (S.D.N.Y. 1988).

   Blake alleges that it retained Video Elephant to serve as its exclusive content manager in September of 2019, and that, pursuant to this role as "agent," "Video Elephant was tasked with identifying, licensing, and securing content for Blake [] that Blake [] could then distribute through its various media channels."  (Answer ¶¶ 12, 17.)  As evidence for the creation of this "agent/principal" relationship, Blake cites a press release dated September 12, 2019, in which the CEO of Video Elephant is quoted as saying it was "delighted and honored to be chosen by [Blake] to act as their exclusive content management company to source and secure programming[.]"  (Answer ¶ 13; Press Release at 2.)  Blake also alleges that, "[a]round this same time," Blake "retained [John] Jordan . . . in his capacity as COO for Video Elephant . . . to serve as a member of Blake['s] 'Key Management Team.'"  (Answer ¶ 14.)  In contravention of the purported agreement by Video Elephant to act as Blake's "exclusive content management agent," and Jordan's role as a member of Blake's "Key Management Team," Blake alleges,

Video Elephant breached its fiduciary duties "[b]y developing its own competing business in secret, and by providing an alternative platform for content previously licensed to Blake[.]" (Answer ¶ 31.)  This alleged breach has, according to Blake, "inflicted enormous harm," including "significant damage on Blake['s] [] business."  (Id. ¶ 33.)

Video Elephant contends that, rather than constituting a generalized fiduciary relationship, "the parties' legal relationship was solely an arm's length contractual relationship, the foundation and boundaries of which were memorialized" in the Three Agreements at issue. (CC-Def. Mem. at 13.)  Video Elephant also disputes the significance of the press release cited by Blake, pointing to provisions in the Agreements that "expressly contemplated that the parties would issue a statement or press release 'describing the relationship between the parties.'" (Docket entry no. 46 ("Reply Mem.") at 3.)  Even if the Court were to find Blake had sufficiently pleaded the existence of a fiduciary relationship, Video Elephant argues, Blake has not adequately demonstrated a breach thereof, as the Agreements lacked non-compete provisions, and "nowhere did Video Elephant agree not to use the content which it provided to Blake on a non-exclusive basis for any other purposes."  (CC-Def. Mem. at 15.)

As pleaded, Blake's counterclaim fails to plausibly allege a relationship of higher trust or obligations beyond those memorialized in the Three Agreements, such that a fiduciary relationship was formed.  Although Blake need not plead the technicalities of the existence of a fiduciary relationship in order to state a claim, its allegations of an agency relationship in particular are conclusory and unsupported.  See White v. Pacifica Found., 973 F. Supp. 2d 363, 377 (S.D.N.Y. 2013) ("[A]n agency relationship exists . . . when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent.").  Blake has not included any factual allegations suggesting that it

retained the requisite control over Video Elephant, "often . . . deemed the essential characteristic of the principal-agent relationship," id., nor allegations that Video Elephant had authority to act on Blake's behalf.  (See generally Answer.)

Even if Video Elephant's alleged role as Blake's "Exclusive Licensing Management Company" could rise to the level of a fiduciary relationship, Blake has not sufficiently identified the duties purportedly embodied in that relationship that were breached. Blake does not allege that, as Blake's "Exclusive Licensing Management Company," Video Elephant agreed not to compete with Blake.  (See generally Answer.)  Blake merely alleges that Video Elephant was "tasked with identifying, licensing, and securing content" (Answer ¶ 17), and the resulting contracts, i.e., the Three Agreements, specifically identify Blake's licenses as non-exclusive.  (FCCE Agreement § 2(a); Bloomberg Agreement, Terms and Conditions § 1.1; Greenlight Agreement § 3(a)).  Blake's allegations of breach of fiduciary duty based on John Jordan's alleged role as a member of Blake's "Key Management Team" are similarly conclusory and devoid of information as to what type of "confidential business information" (Answer ¶¶ 2, 15, 124, 135) was conveyed within the confines of the alleged fiduciary relationship and improperly used by Video Elephant.

In short, there are insufficient facts on the face of the pleading to plausibly support the existence of a fiduciary relationship between Video Elephant and Blake independent of the Three Agreements.  The motion to dismiss the counterclaim for breach of fiduciary duty against Video Elephant (Counterclaim One) is therefore granted without prejudice to an application to replead.  Blake may move for leave to amend this counterclaim to adequately plead the formation and breach of a fiduciary relationship that existed separate and apart from the Three Agreements.

Breach of Contract Counterclaims

       Blake next asserts counterclaims for breach of contract as to each of the Three Agreements, respectively, asserting three distinct theories of breach as to the FCCE Agreement, including breach of warranty.  (See generally Answer.)  To state a claim for breach of contract under New York law, which the Court applies to the construction of the FCCE and Greenlight Agreements,[3] a plaintiff must allege: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Ellington Credit Fund Ltd. v. Select Portfolio Servicing Inc., 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).  A party is relieved of the obligation to perform under a contract only where the other party's breach is "material," i.e., "when the breach goes to the root of the contract," In re Lavigne, 114 F.3d 379, 388 (2d Cir. 1997), which is generally a question of fact.  Orlander v. Staples, Inc., 802 F.3d 289, 298 (2d. Cir. 2015).  To establish a breach of express warranty, a plaintiff must show "(1) plaintiff and defendant entered into a contract; (2) containing an express warranty by the defendant with respect to a material fact; (3) which warranty was part of the basis of the bargain; and (4) the express warranty was breached by defendant."  Promuto v. Waste Mgmt., Inc., 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999) (citation omitted).

       To state a claim for breach of contract under Delaware law, which the Court applies to the interpretation of the Bloomberg Agreement,[4] "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation

---

[3]     See supra pp. 5-8 (explaining choice of law for purposes of this Motion).

[4]     See supra note 3.

imposed by that contract; and third, the resultant damage to the plaintiff."  VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003) (citations omitted).

The Court will address the breach of contract counterclaims in the order presented, beginning with those concerning the FCCE Agreement.

Breach of Contract - FCCE Agreement

Blake first asserts three allegedly material breaches of the FCCE Agreement: (1) breach of the express warranty that FCCE was "the sole owner of all copyright" in all content licensed to Blake under the FCCE Agreement; (2) failure to provide "fresh weekly" content; and (3) breach of the provisions of the FCCE Agreement governing confidentiality.  (Answer ¶¶ 47-71.)

Theory 1: Breach of Warranty

Blake asserts that Video Elephant breached the warranty contained in section 4(b) of the FCCE Agreement, which reads: "[Video Elephant] warrants that [FCCE] is the sole owner of all copyright in [the content] which is granted to [Blake] under this Agreement other than such logos and trademarks and/or title name which are owned by [Blake]."  (Id.)  Blake alleges that it repeatedly attempted, without success, to verify whether FCCE owned rights to certain intellectual property incorporated into the content provided to Blake under the FCCE license (Answer ¶¶ 50-51), and further alleges that Video Elephant failed to offer adequate assurances that FCCE had such rights.  (Id. ¶¶ 52-55.)  As a result of its inability to verify the ownership of the rights, Blake alleges, it was unable to use the content licensed under the Agreement "without risking a potential infringement of another party's copyright rights."  (Id. ¶ 56.)  Video Elephant asserts that Blake's pleading fails to state a claim for breach of express warranty, as "Blake does

not allege, nor can it, that this warranty was breached" (CC-Def. Mem. at 16), and, on Reply,

argues that Blake's allegations of breach are "completely bare."  (Reply Mem. at 7-8.)

   Contrary to Video Elephant's assertion that Blake does not allege a necessary

element of this claim, i.e., breach, Blake explicitly alleges, "[u]pon information and belief," that

"FCCE was not in fact the sole owner of all copyright rights in and to the content licensed to

Blake [] under [the FCCE Agreement]."  (Answer ¶ 144.)  Blake's pleading of its unsuccessful

investigations into the ownership of the sublicensed content's rights also "makes the inference of

[breach] plausible," Arista Records LLC v. Doe, 604 F.3d 110, 120 (2d Cir. 2010), such that its

pleading of breach upon "information and belief" is sufficient at this stage. (See, e.g., Answer ¶

49 (alleging that the FCCE content licensed "contained clips and music from various motion

pictures . . . and television programs); id. ¶¶ 50-54 (alleging that Blake "consulted relevant rights

databases . . . in an attempt to confirm FCCE's rights," that Blake's representatives "spoke with

various business contacts employed with the movie studios that produced the films in question,"

and that Blake contacted Video Elephant, which contacted FCCE, to verify rights ownership).

   Blake has also sufficiently pleaded the remaining elements of breach of express

warranty under New York law.  In the Agreement, Blake "warrant[ed] that [FCCE] [was] the

sole owner of all copyright" in the content "granted to" Blake under the Agreement.  (FCCE

Agreement § 4(b).)  Blake pleaded facts showing its reliance on this warranty as a basis for the

Agreement, as the Agreement contemplated that Blake would retransmit the licensed content

(see id. § 5 (discussing Blake "broadcast[ing]" the content to viewers and homes); see also id. §

2(j)-(l) (discussing cable, television, and digital rights to broadcast or transmit the content)),

which Blake alleges it could not do without risk of litigation absent the protection of the express

warranty.  (Answer ¶ 56.)  Finally, Blake alleges that the purported breach resulted in

"substantial damages."  (Answer ¶¶ 56, 156.)  The motion to dismiss the breach of contract

counterclaim under the FCCE Agreement on the foregoing breach of warranty theory

(Counterclaim Three) is therefore denied.

<u>Theory 2: Failure to Provide Conforming Content</u>

Blake next asserts that Video Elephant breached the terms of the FCCE

Agreement by failing to provide "weekly fresh episodes" as required under sections 1(b), "The

Programme," and 1(g), "The Delivery Schedule," of the FCCE Agreement.[5]  Those provisions

contain largely identical tables detailing the types of programs that would be licensed under the

deal, and a schedule of delivery for episodes of each program.  (FCCE Agreement § 1(b), (g).)

The first six programs that were to be provided are listed under the header "Weekly fresh

episodes."  (FCCE Agreement § 1(b), (g).)  The Agreement also provided for the delivery of one

program under the header "Specials," which was entitled "Festival reports," and was to be

provided "no later than . . . 1 week after the event."  (FCCE Agreement § 1(b), (g).)

Blake alleges that FCCE "ceased producing new content" after the onset of the

COVID-19 pandemic, instead providing Blake with "repurposed old, pre-pandemic content

altered to appear like new content," thereby breaching the requirement for "[w]eekly fresh

episodes."  (Answer ¶¶ 59-60.)  As evidence that "neither [Video Elephant] nor FCCE could

perform under the FCCE [Agreement] given the effects of the pandemic,"  Blake points to an

email sent to FCCE by Video Elephant in which Video Elephant invokes the force majeure

clause of the parent license agreement between Video Elephant and FCCE as the basis for

---

[5]     The text of the Agreement features errors with numbering and lettering.  For the sake of
       clarity, the Court will refer to the "Definitions" section, beginning on page 1 of the FCCE
       Agreement, as section 1(a)-1(n), from the term "The Producer" through the term "The
       License Period."  (<u>See</u> FCCE Agreement at 1-2.)

"suspending the [parent] agreement for 3 months from the 1st May, or until such time as the

agreement can actually be performed[.]" (Id. ¶ 63.)[6]  While acknowledging that "[t]he episodes

provided to Blake were filmed 'pre-pandemic'" (CC-Def. Mem. at 19), Video Elephant denies

breach of the Agreement, arguing that its provision of "new non-duplicative content on a weekly

basis pursuant to the schedule in the agreement" fulfilled its obligation to provide "[w]eekly

fresh episodes" under the Agreement, and that Video Elephant's "purported reliance on a force

majeure provision in a separate contract has no import."  (Reply Mem. at 8.)

        Blake's counterclaim for breach of contract as to this provision of the Agreement

thus raises a question as to the proper interpretation of the term "[w]eekly fresh episodes."  "It is

well accepted that courts should construe contracts according to the parties' intent," as derived

"from the plain meaning of the language employed in the [relevant agreement]" when the

agreement is "read as a whole."  A.X.M.S. Corp. v. Friedman, 948 F. Supp. 2d 319, 332

(S.D.N.Y. 2013) (citations omitted).  Whether a contract is unambiguous is "a question of law

for the court."  Continental Ins. Co. v. Atl. Cas. Ins. Co., 603 F.3d 169, 180 (2d Cir.

2010) (citation omitted).  Under New York law, a contract will be found to be ambiguous if it is

"capable of more than one meaning when viewed objectively by a reasonably intelligent person

who has examined the context of the entire integrated agreement."  Krumme v. Westpoint

Stevens Inc., 238 F.3d 133, 138-39 (2d Cir. 2000) (citation omitted).  Because a reviewing court

---

[6]      Video Elephant denies that its action under its license agreement with FCCE is relevant
        and points out that force majeure is a defense to a claim of contract breach, rather than a
        basis for a claim of breach.  (CC-Def. Mem. at 19; Reply Mem. at 8.)  Neither party
        addresses the force majeure provision of the Video Elephant/Blake FCCE Agreement,
        which provides that inability to perform "for any reason beyond the reasonable control of
        either party including war, industrial action, floods, Acts of God then such
        nonperformance or failure to fulfil its obligations shall be deemed not to be a breach of
        this agreement" and permits either party to terminate the contract by written notice after
        the interruption has continued for three months.  (FCCE Agreement § 6(h).)

must "resolve any contractual ambiguities in favor of the plaintiff" on a Rule 12(b)(6) motion, Subaru Distribs. Corp. v. Subaru of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005), a plaintiff's claim should not be dismissed if the plaintiff "has an arguable claim under the contract." Axiom Inv. Advisors, LLC v. Deutsche Bank AG, 234 F. Supp. 3d 526, 533 (S.D.N.Y. 2017).

Looking to the text of the FCCE Agreement, the first six categories of required programming fall under the header "Weekly fresh episodes." (FCCE Agreement § 1(b), (g).) As written in the Agreement, "weekly" and "fresh" both modify "episodes." The parties do not dispute that Video Elephant delivered episodes for each type of program on a weekly basis where required under the FCCE Agreement. Rather, the dispute centers on whether the episodes were "fresh," with each party advancing a different interpretation of what "fresh" was intended to mean—"fresh" as in created out of material not existing previously (Answer ¶¶ 58-60, 62; CC-Pltf. Mem. at 20), or "fresh" as in non-duplicative and not existing previously in a particular edited form. (Reply Mem. at 8.) Beyond the tables provided in the definitions of "The Programme" and "The Delivery Schedule," there do not appear to be any additional provisions clarifying the nature of the content to be provided.[7] (See generally FCCE Agreement.) The fact that two of the programs listed under "[w]eekly fresh episodes" are "News" programs (see FCCE Agreement § 1(b)) could lend support to either proposed interpretation, as the "news" program nomenclature would suggest a program consisting of material that covers recent events, but

---

[7]     There is language on page 3 of the FCCE Agreement requiring Video Elephant to "deliver new technical materials on a weekly basis as per the Delivery Schedule." (FCCE Agreement § 4(a).) However, "technical materials" are defined in the FCCE Agreement to mean all "episodes" required to be provided under "The Programme" and "The Delivery Schedule." (Id. § 1(e).) The word "new" in this context is therefore not particularly illuminating as to the meaning of "[w]eekly fresh episodes," which refers to only a subset of the programs for which Video Elephant was responsible for delivering episodes. (See id. § 1(b), (g).)

nothing in the FCCE Agreement suggests that the news featured in the relevant programs had to be from a particular time frame.  (Cf. FCCE Agreement § 1(g) (providing that episodes of the program listed under the "Specials" category of programming, "CBNN Front Row," were to be delivered "1 week after the event").)

Having reviewed the text of the FCCE Agreement as a whole, the Court finds that there is a "reasonable basis for a difference of opinion," such that the language "[w]eekly fresh episodes" is ambiguous.  Krumme, 238 F.3d at 139.  Because Blake's proposed interpretation of the disputed ambiguous language, "[w]eekly fresh episodes," is reasonable, finding support in the text of the FCCE Agreement, its allegations as to breach of contract of this provision of the FCCE Agreement are sufficient to withstand Video Elephant's motion to dismiss.  The motion to dismiss the breach of contract counterclaim under the FCCE Agreement based on failure to provide conforming content (Counterclaim Three) is therefore denied.

### Theory 3: Breach of the FCCE Confidentiality Provision

Finally, Blake asserts that Video Elephant breached the FCCE Agreement by, "[u]pon information and belief, . . . disclos[ing] confidential business information it obtained from Blake [] during the life of the FCCE Sublicensing Deal to FCCE and other third parties," in violation of the confidentiality provisions contained in the "Miscellaneous" section of the Agreement.  (See Answer ¶ 68; FCCE Agreement at 4.)  The relevant provision reads:

> [Video Elephant], [Blake] and [FCCE] shall not disclose to any third party any confidential business or future plans of the other party acquired at any time during the existence of this agreement and no reference is to be made to the terms of this agreement by either party in any advertising, publicity or promotional material without the prior consent of the other party.

(FCCE Agreement § 6(c) (the "Confidentiality Provision").)  Blake alleges that the disclosed information "included, but is not limited to, information Video Elephant obtained through [John]

Jordan's work drafting and developing a revised draft" of Blake's business plan, and further alleges, "upon information and belief," that "FCCE advised third parties regarding the existence and terms of the FCCE Sublicensing Deal in order to secure other licensing deals with such parties," and that "Video Elephant made no effort to prevent FCCE from doing so[.]"  (Answer ¶¶ 69-71.)

This theory of breach fails to state a claim.  To start, Video Elephant is correct that there are insufficient facts alleged to support the counterclaim.  (CC-Def. Mem. at 19-20; Reply Mem. at 8-9.)  While Blake is entitled to plead on information and belief "where the facts are peculiarly within the possession and control of the defendant . . . or where the belief is based on factual information that makes the inference of culpability plausible," Arista Records LLC v. Doe, 604 F.3d 110, 120 (2d Cir. 2010), Blake has alleged no facts to indicate why it believes Video Elephant has breached the Confidentiality Provision, e.g., how Blake learned of the purported breach, to whom Blake believes Video Elephant disclosed (other than FCCE), what was disclosed, when, and for what purpose.  Absent such facts to support its claim, Blake's conclusory assertion that there was a breach "upon information and belief" is insufficient to raise a plausible claim for breach of contract.  See, e.g., Teixeira v. St. Jude Med. S.C., Inc., 193 F. Supp. 3d 218, 229 (W.D.N.Y. 2016) (citing Arista Records, 604 F.3d at 121) ("[A]llegations based on 'information and belief' cannot be wholly unsupported.")

Moreover, the Confidentiality Provision reads that "[Video Elephant], [Blake] and [FCCE] shall not disclose to any third party any confidential business or future plans of the other party" (FCCE Agreement at 4 (emphasis added)), meaning that FCCE is most reasonably understood to be a "party," not a "third party," according to the plain language of the

Agreement.[8]  The Confidentiality Provision therefore appears to contemplate that FCCE would be privy to "confidential business or future plans" of Blake "acquired . . . during the existence of [the] agreement."  (Id.)  If that were not the case, there would be no reason to attempt to prohibit FCCE from disclosing that information to third parties.  (Id. ("[FCCE] shall not disclose to any third party . . .").)  The Confidentiality Provision also does not prohibit Video Elephant from disclosing "confidential business or future plans" directly to FCCE, even if FCCE did not otherwise acquire such information—the provision merely prohibits Video Elephant from disclosing "to any third party."  (Id.)

Finally, the FCCE Agreement does not appear to place any affirmative duty on Video Elephant to "ensure that . . . FCCE would [not] disclose any confidential information of Blake [] to any third party[.]"  (Answer ¶ 153; see also id. ¶ 71.)   Blake does not identify what language in the Confidentiality Provision or elsewhere it believes gives rise to that obligation, referring generally to "that provision" and "Video Elephant's obligations under the Deal."  (Id. ¶¶ 71, 155.)  Absent such an obligation arising in the contract, there can be no breach.  Belsito Communs., Inc. v. Dell, Inc., No. 12-CV-6255-CS, 2013 WL 4860585, at *5 (S.D.N.Y. Sept. 12, 2013) (citations and internal quotation marks omitted) ("[U]nder New York law, a breach of contract plaintiff must identify specifically breached contract terms.").

In short, the motion to dismiss is denied as to Blake's first two theories for breach of contract as to the FCCE Agreement, i.e., breach of express warranty and breach of contract for failing to provide conforming content.  Blake's counterclaim for breach of contract as to the Confidentiality Provision is dismissed without prejudice to a motion for leave to replead.  Blake

---

[8]      While FCCE is identified as a "party" and its disclosure is purportedly restricted by the Confidentiality Provision, FCCE is not a signatory to the FCCE Agreement between Blake and Video Elephant and is therefore not a legal party to the contract.

may move for leave to amend the counterclaim based on the final theory, breach of the

Confidentiality Provision, to include further details with respect to Video Elephant's alleged

disclosure of confidential business information or future plans acquired during the existence of

the FCCE Agreement to "third parties."

<u>Breach of Contract – Bloomberg Agreement</u>

Blake next asserts that Video Elephant breached the Bloomberg Agreement "by

failing to ensure that Blake [] received the Bloomberg content in a manner usable by Blake

Broadcasting."  (Answer ¶ 80.)  In particular, Blake alleges that the content provided by Video

Elephant under the Bloomberg Agreement "was plagued by near constant and consistent

technical issues that delayed delivery . . . prevented Blake [] from distributing the content

properly through its various media channels, and made it impossible for Blake [] to run

advertisements along with the content."  (Id. ¶ 81.)  Blake asserts that Video Elephant's failure to

provide conforming content amounted to a material breach of the Bloomberg Agreement,

resulting in substantial damages to Blake.  (Id. ¶¶ 163-64.)  Video Elephant asserts that Blake's

allegations fail to state a claim, as "Blake fails to identify any provisions of the agreement that

were breached," and alleges that Blake did receive content according to the terms of the

Agreement.  (CC-Def. Mem. at 20; Reply Mem. at 9.)

The Court agrees that Blake has failed to plead plausibly that Video Elephant

breached the Bloomberg Agreement.  The sole provision of the Bloomberg Agreement cited in

Blake's pleading of this counterclaim is section 1.1 of the Terms and Conditions, which

stipulates that the content (the "Product(s)"[9]) "shall be delivered to [Blake] by Bloomberg via

---

[9]     The "Product(s)" are defined in the Agreement to mean "Bloomberg Linear TV Feed and
Bloomberg Video (long and short form)."  (Bloomberg Agreement § 2.)  The only further
description of the sublicensed content provided in the Agreement is the term "Volume"—

mutually agreed-upon method at no extra cost."  (Bloomberg Agreement, Terms and Conditions § 1.1.)  Blake does not allege that Video Elephant failed to have Bloomberg deliver the "Product(s)" "via mutually agreed-upon method," nor does Blake identify any other provision in the Agreement dictating technical specifications for the form or delivery of the "Product(s)" that could and did give rise to breach.  Blake has therefore failed to identify a necessary element of breach of contract under Delaware law: "the breach of an obligation imposed by [the relevant] contract."  VLIW Tech., L.L.C. v. Hewlett-Packard Co., 840 A.2d 606, 612 (Del. 2003); see also Shaev v. Adkerson, No. 10436-VCN, 2015 WL 5882942, at *4 (Del. Ch. Oct. 5, 2015) (quoting Wal-Mart Stores, Inc. v. AIG Life Ins. Co., 901 A.2d 106, 116 (Del. 2006)) ("Where a plaintiff fails to identify any contract provision that was breached, the 'count fails to state a claim upon which relief may be granted.'").

Blake argues that "provision of defective goods is a breach" in and of itself, citing a decision regarding the sale of goods governed by the Uniform Commercial Code ("UCC") (CC-Pltf. Mem. at 22 (citing Log Plastics Products v. Robert Linkletter Assc., Inc., No. 87-CV-3482, 1988 WL 9955, at *4 (S.D.N.Y. Feb. 2, 1988)), and an inapposite decision concerning breach of a construction contract where performance could be measured against the contract and the relevant county's building code.  (CC-Pltf. Mem. at 22 (citing Leary v. Oswald, No. 06C-02-030, 2006 WL 3587249, at *2 (Del. Oct. 25, 2006).)  Blake has not asserted in its pleading that the UCC should govern the Bloomberg Agreement; Blake applies common law principles in asserting breach.  (See Answer ¶ 163 (emphasis added) ("Video Elephant's failure to provide

---

which is not incorporated into the definition of "Product(s)" or otherwise referenced in the Agreement—defined as "[u]p to five (5) hours per day of scheduled television programming; 50 long form videos per year and 400 short form videos per month."  (Id. § 3.)

Blake [] with the content specified under the Bloomberg Sublicensing Deal constituted a <u>material breach</u> of the Deal.").)  Even if the UCC did apply, the breach of contract counterclaim as pleaded would still fail to state a claim—Blake's pleading does not specify whether the content did not "actually work" (CC-Pltf. Mem. at 21-22) because of a flaw with the delivered content itself, or whether the content was unusable because it did not conform to specifications—not contracted for in the Agreement—that were necessary to render the content compatible with Blake's systems and network.  (<u>See</u> Answer ¶ 82 (detailing the alleged technical issues with the sublicensed content)); <u>see also</u> N.Y. U.C.C. § 2-601 (emphasis added) (defining nonconforming goods as the failure of "the goods" "to <u>conform to the contract</u>" "in any respect").

The breach of contract counterclaim under the Bloomberg Agreement, Counterclaim Four, is therefore dismissed without prejudice to a motion for leave to replead. Blake may move for leave to amend this counterclaim to include details as to which specific provision of the Bloomberg Agreement was breached and the nature of the breach.

<u>Breach of Contract – Greenlight Agreement</u>

Blake's final breach of contract counterclaim asserts Video Elephant's breach of the Greenlight Agreement, again based on the failure to provide "new" content delivered "weekly," per the terms of the Greenlight Agreement.[10]  (Answer ¶¶ 172-78.)  Several provisions reference the requirement that Blake be provided with "new" content on a weekly basis.  (<u>See</u> Greenlight Agreement § 2(a) (defining "The Programme" to total "1.5 broadcast hours of new

---

[10]    Blake also alleges that the content delivered under the Greenlight Agreement was "virtually unusable as a result of technical issues" at the start of the contract term, which were "eventually resolved" after Blake "promptly notified Video Elephant of these issues on and around January 14, 2020."  (Answer ¶¶ 98-99.)  Blake does not appear to base its assertion of material breach on these purported technical issues, identifying no relevant provision of the Agreement in its discussion of these issues, and the parties' briefing is limited to Blake's allegations that the content was not "new."

programmes per week"); id. § 2(f) (defining "The Delivery Schedule" to be "the delivery dates of new episodes as per" the schedule provided); id. § 5(a) (requiring Video Elephant to "continue to deliver new technical materials on a weekly basis as per the Delivery Schedule").) Video Elephant again contends that it provided episodes of the required programs consistent with the Greenlight Agreement's Delivery Schedule, and disputes Blake's interpretation of the term "new" to mean episodes consisting of entirely new material, rather than non-duplicative content. (CC-Def. Mem. at 21; Reply Mem. at 9.)

As with the breach of contract counterclaim under the FCCE Agreement for failure to provide conforming content, the Court finds that the Blake has advanced a reasonable interpretation of an ambiguous term in the contract—"new." The Greenlight Agreement provides some additional color to the meaning of the term "new" under the definition of the term "The Programme," (Greenlight Agreement § 2(a)), requiring that the two identified programs be "weekly created . . . and delivered weekly." (Id.) The description "[w]eekly created," does not, however, weigh definitively in favor of either party's proposed interpretation—"weekly created" could mean the episodes are "weekly created" out of new material filmed that week, or it could mean that the episodes are "weekly created" in that the episodes are edited together to create non-duplicative content on a weekly basis, regardless of when the material making up that episode was filmed.

Because the term "new" is thus "capable of more than one meaning when viewed objectively," taking the entire Greenlight Agreement into account, see Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011), and because Blake has advanced a reasonable interpretation of the term in alleging breach of the Greenlight Agreement, the motion

to dismiss is denied as to the counterclaim for breach of contract under the Greenlight Agreement (Counterclaim Six).

Breach of Contract Counterclaims – Alleged Damages

Video Elephant raises a final argument in its briefing regarding the element of damages, asserting that Blake's allegations of damages are improper consequential damages, namely lost profits that are too speculative to quantify and that were not contemplated by the parties, and alleging that at least one contract contained a provision limiting liability for consequential damages. (CC-Def. Mem. at 22-25.) According to Video Elephant, because Blake suffered no recoverable damages, Blake's "Third, Fourth and Sixth Counterclaims," i.e., the counterclaims for breach of contract as to each of the Three Agreements, "must be dismissed." (Id. at 25.) Blake contends that arguments regarding the form of damages are "not appropriately raised on a motion to dismiss." (CC-Pltf. Mem. at 24.)

The Court finds that Blake's pleading of damages (Answer ¶¶ 156, 164, 178) is sufficient at this stage to withstand Video Elephant's motion to dismiss. While courts have occasionally addressed the issue of lost profits in reviewing motions to dismiss, rather than solely on motions for summary judgment, Robin Bay Assocs., LLC v. Merrill Lynch & Co., No. 07-CV-376-JMB, 2008 WL 2275902, at *7 (S.D.N.Y. June 3, 2008) (gathering cases), the Court will be in a better position to evaluate whether lost profits in this case would "require an unreasonable level of speculation" when the parties have had the opportunity to fully brief the issue, particularly addressing whether the business activity contemplated by the Three Agreements, namely free video distribution with revenue generated by accompanying advertising (docket entry no. 33-2 (describing Blake's newly launched "free OTT streaming service," which is "ad-supported")), was regularly conducted by Blake, or amounted to a new

type of business, such that it might be more difficult to reasonably calculate damages.  See Robin Bay Assocs., 2008 WL 2275902, at *7-*8.  The motion to dismiss Counterclaims Three, Four, and Six on the basis of improper damages allegations is therefore denied.

<u>CONCLUSION</u>

For the reasons explained above, Video Elephant's motion to dismiss is granted in part and denied in part.  The Third Counterclaim for breach of the FCCE agreement is dismissed only as to the asserted breach of the Confidentiality Provision, and the First and Fourth Counterclaims are dismissed in their entirety.  Blake is, however, hereby granted permission to move for leave to replead these counterclaims in an amended complaint, which motion must be filed within 30 days from the date of this Memorandum Order.  The proposed amended counterclaims must be attached to the motion, together with a copy redlined against the counterclaims pleaded in docket entry no. 33.  Should Blake fail to file a motion for leave to amend within 30 days of the issuance of this Memorandum Order, or should such motion be denied as futile, the First and Fourth Counterclaims, and the Third Counterclaim with respect to the claim for breach of the Confidentiality Provision, shall be dismissed with prejudice.  The motion to dismiss is denied in all other respects.

Docket entry no. 40 is resolved.

SO ORDERED.
Dated: New York, New York
        January 5, 2024

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
Chief United States District Judge